---

(39 Misc. Rep. 63.)

## In re ELSTER'S WILL.

(Surrogate's Court, Cortland County.　October, 1902.)

1. WILLS—UNDUE INFLUENCE.

Testator was old, feeble, and unable to read or write. One beneficiary dictated his will a few days before his death to the ·scrivener, and it was executed in the presence of both beneficiaries, one his son, and the other his wife, who had been married to him for one year. The will disinherited another son and a grandchild without any apparent reason. *Held*, that the will would be rejected as executed under undue influence.

In the matter of the will of Orlando Elster, deceased. Probate denied.

F. Hatch, for executor.

J. & T. E. Courtney, for Mortimer Elster.

C. M. Flint, special guardian and attorney in person for Blanche Elliott.

EGGLESTON, S. The paper offered by the proponent for probate as the last will and testament of Orlando Elster, deceased, bears date the 19th day of April, 1902, and by its provisions disposes of the real and personal property of the testator.

On the 5th day of May, 1902, Orlando Elster, the testator, died in the town of Virgil, in this county, and was of the age of 76 years. He left, him surviving, Mary E. Elster, his widow, to whom he had been married about a year; one son, Wellington Elster, who lived in the town of Cortlandville, in this county; one son, Mortimer Elster, living in the town of Virgil; and a granddaughter, Blanche Elliott, a daughter of a deceased daughter of the testator, residing in an adjoining town about three miles distant. By the terms of the proposed will, the testator gave the use of all his property to his wife during the term of her life, and at her death all was to go to the son Wellington Elster, who was also made the executor of the will. At least two wills had been made by the testator prior to the making of the paper offered for probate, one about a year previous and one about five years previous. The paper offered for probate purports to have been signed by the testator by making his mark. The only persons present with the testator at the time of the execution of the will were the two witnesses, and the two persons who are the sole beneficiaries under the will. This paper was drawn by William A. Holton at his store in Virgil, which store was about 30 rods from the residence of the testator. On the day of the execution of the will, the son Wellington Elster went to Mr. Holton's store and gave the direction to him for the drawing of the will. Up to this time Mr. Holton had no word of conversation or instruction directly from the testator as to the drawing of the will, but prepared the will entirely from the dictation and direction given to him by Wellington Elster; then, taking the paper already prepared, he went to the residence of the testator, and, taking him into an adjoining room from where the two beneficiaries of the will and the other subscribing witness were, read the will over to the testator, who stated that it was as he wanted it; then, coming back into the room where the other witness and the two beneficiaries under the will were, the testator made his mark, and, in response to questions asked him, acknowledged the instrument to be his will, requesting the witnesses to sign the same. The paper was signed by the testator in the presence of the two subscribing witnesses by making his mark.

That is substantially the evidence as given by the subscribing witnesses, and also is evidenced by the fact that the ink of the mark, and the signatures and places of residence of the subscribing witnesses, is of different color from that of the writing in the will. It is very evident that the writing in the will and the attestation clause was made by the scrivener prior to his going to the home of the testator. Even the words, "Orlando Elster, his mark," were evident-

ly so written before going to the house. This would indicate very clearly that the signature by mark and the signatures of the witnesses were made at the same time at the house of Mr. Elster. It would also indicate very clearly that all the detail work of the drawing of the will was done at the store of Mr. Holton, and directed by the son Wellington Elster. The execution of the will seems to have been carried out in a somewhat hurried manner. Mr. Holton states that he was in a hurry about his work, and Mrs. Curtis states that she thinks that they occupied about five minutes in the execution of the will.

There are many facts and circumstances connected with this case, as shown from the evidence, which are of a suspicious character, and call for a careful consideration upon the part of the trial court, as they are of sufficient significance to put one upon inquiry. We have in the case a man of 76 years of age, somewhat feeble in health, who has made prior wills, one within a year prior to the making of the one offered for probate, who now makes a will giving his property to his wife and one son, disinheriting another son, and also disinheriting a granddaughter, who is an infant and the only child of a deceased daughter.

Again, the will is drawn under the direction, at least, of one of the main beneficiaries in the will, who gave all of the directions as to the preparation of the will, and was present with the other beneficiary in the room at the time of its execution; the apparent unequal and unjust discrimination, on the part of the testator, in the disposition of his property; the will is signed by the testator by the making of his mark, and had been fully prepared before taking it to him; the son Wellington Elster is made executor of the will. The testator could neither read nor write; his hearing was somewhat impaired. Its execution was hurriedly done,—the death of the testator occurred within a few days after its execution. It is not explained why the testator himself did not go to the store of Mr. Holton, which was only a short distance from his house, as it appears he was able to walk about the house, and, while it does appear that he was in feeble health, just what his condition was is not shown. The widow was the wife of a year, and not the wife of his many years and the mother of his children. While the evidence as to the execution of the will is not very strong or convincing, yet I am satisfied that it is sufficient to show a due execution in that respect.

One of the objections urged against the probate of the will is that of fraud and undue influence, and that the testator was under restraint at the time of the execution of the will. Before this proposed will can be admitted to probate, it must be made to appear that at the time of its execution the testator was in all respects competent to make a will, and not under restraint. Code Civ. Proc. § 2623. If this paper, so executed and presented in court at this time, is really an expression of the testator's mind and intention, free, voluntary, and original,— and it is incumbent upon the proponents to show affirmatively that it is,—then it should be admitted to probate as a valid will. If, however, it expresses merely an intention which has been created by others, by what the law recognizes as undue and improper influences,.

although he had testamentary intelligence and the paper executed by him expressed his then wish and intention as to the disposition of his property, it would be void, and not entitled to probate. What is undue restraint or influence has been a subject of much discussion. No well-defined rule of law can be laid down that would be controlling in every case, for the reason that each case rests upon the facts peculiar to that class alone. A state of facts might be presented in one case which would establish undue influence or undue restraint, which, presented in another case, under different circumstances and different surroundings, explained in a different way, would not be considered of a character to avoid the will. It is, however, a well-established rule, as evidenced by a long line of decisions in the courts, that, when the surrogate is not satisfied that the will was properly executed, or that the testator, at the time of executing it, was in all respects competent to make a will, and not under restraint, then the court is bound to pronounce its opinion that the instrument is not entitled to probate. Delafield v. Parish, 25 N. Y. 35; Cooper v. Benedict, 3 Dem. Sur. 136; Lee v. Dill, 11 Abb. Prac. 214; Van Pelt v. Van Pelt, 30 Barb. 134; Forman v. Smith, 7 Lans. 443; In re Clausmann, 5 N. Y. St. Rep. 329. Influence or restraint is undue if it is such that it has worked a wrong to some one which would not have occurred had it not been exercised. It is not indispensable that there should be direct proof of undue influence; it may be inferred from the circumstances, but the circumstances must be such as to lead justly to the inference that undue influence was employed by persons interested in the disposition of the property, so that the will does not express the real wishes of the testator.

The circumstances surrounding the execution of this will are indeed peculiar, and lead to but one conclusion, and that is, that the two beneficiaries named in the will were instrumental in producing a will to be made in their favor. Its execution was not attended with that care and precaution which would do away with that fact, and it seems to have been done under the observation and control of the wife and the one son. The son gives entire direction as to the drawing of the will. The will is taken to the house of the testator, and, while it appears he was called into an adjoining room and it was read over to him, yet, when it comes to its execution, he is brought back into the room again, where the wife and son are, and they sit by watching its execution. This is a very significant act, and would not leave a man of advanced age, weakened in mind and body, to fully act upon his own part, and leads almost irresistibly to the conclusion that the will had been prepared by some prearrangement, and was closely followed up in its execution by close observation upon their part. No apparent reason is shown why the testator should have disinherited others who were natural objects of his bounty. As has been stated, "A will should not be procured by one or two members of the family while the other members are beyond the paternal roof, and entirely ignorant of what is being done in their absence." Lee v. Dill, 11 Abb. Prac. 214. The fact that a beneficiary gives the direction or dictation for the making of a will excites the greatest suspicion against it, and an additional burden is cast upon the proponent to show by the clearest and most

satisfactory proof that it is the will of the testator.   Delafield v. Parish, 25 N. Y. 35.   Where a will has been prepared or procured by one interested in its provisions, an additional burden is imposed upon those who seek to establish it; the circumstances are regarded by the court with suspicion and jealousy, and there must be stronger proof than would else be required that the paper propounded expresses the free, unbiased testamentary purpose of the alleged testator, and not merely the wishes of the interested beneficiary.   In re Estate of Peck, 10 N. Y. St. Rep. 698.   If a party writes or prepares a will under which he takes a benefit, that is a circumstance which ought generally to excite the suspicion of the court, and calls upon it to be vigilant and jealous in examining the support of the instrument, in favor of which it ought not to pronounce unless the suspicion is removed, and it is judicially satisfied that the paper propounded does express the true will of the deceased.   Newhouse v. Godwin, 17 Barb. 236.   The proposed will is an unequal will, inasmuch as it entirely ignores certain near relatives of the testator and gives all of the property to others. It requires no stretch of imagination to find that the wife and the one son were interested in having the will made at this time.   Evidently the testator was in a feeble condition, and could be expected to live but a short time, as his death followed in a few days, and the making and the execution of the will was carefully watched by them in the absence of the other son and the grandchild.   The provisions of the will are manifestly unjust and unfair in discriminating in favor of certain members of the family to the utter exclusion of the others, and this is presumption of undue influence.   Jessup, in his Surrogate's Practice (page 431), says:

"Where the evidence shows that the will propounded ignores or disinherits those remembered by the testator in prior wills, or who were dependent upon the testator or whom the testator has previously regarded with affection, etc., and the will contested was made by the testator in a last illness or under circumstances of great bodily weakness or infirmity, in favor of the person accused of exerting undue influence, the surrogate will require explicit affirmative proof of the absence of fraud or imposition."

As to the condition of the testator's mind at the time of the execution of the will, or as to his testamentary capacity as given by the subscribing witnesses, the evidence is not very explicit, and is not entirely satisfactory.   The subscribing witness, Mr. Holton, states as follows:

"Q. State whether or not, in your opinion, he was mentally competent to make a will, to will personal property and real estate.   A. I had no reason to doubt his competency at all.   Q. That is not quite the question.   A. Why, yes, of course, I considered him competent.   Q. And that is your opinion now? A. Yes."

The other subscribing witness, Mrs. Curtis, when interrogated upon that subject, states as follows:

"Q. What do you say in your opinion, on this occasion in question, on the 19th of April last, as to whether he (the testator) was mentally competent, of sound mind, capable of making a will of personal and real property?   A. I called him so.   Q. Well, do you say that he was?   Mr. Courtney:  Now, I object to it.   The Surrogate:   She might have called him so and not think so; I think she may state whether she considered him so.   A. Why, I called him all right for making a will.   By Mr. Hatch:   Did you consider and believe

him to be all right? Mr. Courtney: That I object to as leading, suggestive, and improper. [Objection overruled.] By Mr. Hatch: The trouble is in using the word 'call' for 'believe'? A. Yes. Q. Now, won't you please answer my question specifically. In your opinion, at the time he signed this paper, was he competent or incompetent; was he mentally sound or unsound? A. Sound?"

Considering this evidence in the light of the other evidence in the case, while it may be considered barely sufficient to show testamentary capacity upon the part of the person making the will, yet it does disclose the fact that the person was in that condition of mind that he might be easily imposed upon, or easily controlled by other persons. Under the circumstances here disclosed, the ordinary presumptions flowing from the act of formal execution do not obtain, but the burden is thrown upon the parties seeking to establish the testamentary act to show that all those precautions were taken, and those explanations were had, that were necessary to secure to the party the full, free, and unbiased action of his impaired faculties. The law looks with a very jealous eye upon any one who, standing in a friendly or confidential relation with the testator, procures, dictates, directs, superintends, or in any way influences the testator in the disposition of his property, especially if such disposition is to his personal advantage.

It is not one fact alone in this case that speaks against the proposed will, but it is a combination of facts and circumstances attending its making and execution, which, taken together, lead to the irresistible conclusion that undue influence and restraint were used in obtaining the same. The advanced age of the testator; impaired faculties; feebleness of mind and body; inability to read and write; the signing of the will by mark; the drawing of the will solely under the direction and dictation of one of the chief beneficiaries; the witnessing of the execution by all the legatees in the presence of the subscribing witnesses; the disinheriting of others who would seem to be bound to him by ties of blood and affection, and who would seem to be objects of his bounty without apparent reason; previous wills made; short duration of time between the making of the will and the death of the testator,—these are significant facts, startling in their nature, especially so when considered in connection with the weakness of the evidence of the subscribing witnesses as to competency and execution; and, when added to this, the fact that one of the contesting parties is an infant, who, if the will prevails, is cut off from taking property which now rightfully belongs to her, then you have a case presented which seems to ask for the interference of the court. While courts stand between the living and the dead, and seek in all proper cases to carry out the expressed wishes of a deceased person, yet they are not called upon to strain after probate, nor in any case to grant it where stubborn facts oppose and grave doubts exist as to the justness of so doing.

Undoubtedly the facts presented in this case have been occasioned more by the zealousness of the parties to obtain the property than by any fraudulent intent upon their part. The means employed are subject to criticism, but may be excusable in a measure by the opportunity afforded and ignorance as to the guarded way the law

insists that every person shall be permitted to make a testamentary disposition of his property, uncontrolled and unbiased by influence or restraint, and the suspicion with which it looks upon any act which would give color to an attempt to divert the mind of a person weakened in body and intellect from exercising his own desire and intention.

For the reasons stated the probate of the proposed will is denied.

Probate denied.